[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This lawsuit first came to this Court by a complaint dated November 6, 1996 and returnable December 3, 1996 claiming a dissolution of marriage, alimony, exclusive use and possession of the family residence, transfer of the Defendant's interest in the residence to the Plaintiff, a division of pension assets, an allowance to prosecute and an equitable property settlement.
The Defendant appeared by counsel on November 8, 1996.
On November 21, 1996, the Defendant filed an answer to the complaint and a cross complaint, which cross complaint claimed a dissolution of marriage and an equitable division of real and personal property.
On April 17, 1997, a motion for alimony pendente lite was filed by the Plaintiff and on June 17, 1997, the Court, Booth, J., ordered the Defendant to pay $50.00 per week.
In addition, the Court, Booth, J., ordered the Defendant to pay any arrearage for the period April 28, 1997 to date of the hearing, the payment to be made by June 24, 1997.
On April 17, 1997, the Plaintiff filed a motion to enjoin, which was heard by the Court, Booth, J., on June 17, 1997, whereby the Defendant was enjoined from transferring the sum of $150,000.00 from the total of funds constituting his Kemper Fund.
On December 8, 1997, the Plaintiff filed a motion entitled "Pendente Lite motion to enjoin and for payment" concerning a certain life insurance policy requesting that the Defendant continue to maintain the policy and keep it current and pay all premiums to date.
This motion was granted by the Court, Solomon, J., on December 22, 1997.
Various financial affidavits were filed, incident to the foregoing motions.
The matter came on for hearing by the Court commencing on February 20, 1998 and continued on February 25, 1998 and February CT Page 3374 27, 1998 to a conclusion.
The Plaintiff and the Defendant and their respective counsel were present throughout the proceedings.
The Court makes the following findings of fact.
The Plaintiff is age 58.
The parties separated in November 1997 when the Defendant left to go to San Diego, California.
Plaintiff has nine siblings, she graduated from New London High School and was age 16 when she first met the Defendant.
The parties were married on March 30, 1957 when the Plaintiff was age 17.
The Defendant at the time of marriage was in the United States Coast Guard at the Academy in New London serving as an enlisted man.
The parties had five children issue of the union, Victoria, Ruddy Jr., Ronnie, Randy and Robert.
The parties lived in Hawaii at one time and also the Philippines, mindful of the Defendant's military status.
The Defendant was stationed at Governor's Island, New York for a time.
The raising of the children in large measure fell to the Plaintiff due to frequent absences of the Defendant on Coast Guard matters and service.
Plaintiff worked outside the home from time to time at supermarkets or Bradlees.
The Defendant was the principal disciplinarian as concerns the children.
All of the children seem to have turned out well, no conflicts with the law and some attended college.
There have been some minor instances of physical violence by CT Page 3375 the Defendant to the Plaintiff, but nothing of a serious nature.
The Defendant retired from the Coast Guard after serving 20 years and then secured a Civil Service position at the Coast Guard Academy, which lasted until 1995.
The Defendant has had surgery on his shoulder and his back for slipped discs.
Notwithstanding his back problems, the Defendant did all the maintenance and yard work on the home.
In June of 1989, Victoria, the oldest child of the parties, was untimely killed in a motor vehicle accident.
In 1991, the Defendant filed a petition for a dissolution of the marriage, but it was never pressed to a conclusion.
The Plaintiff was named as Administratrix of her daughter Victoria's estate, and in due course, a settlement was effected and the Administratrix Plaintiff received a net check of $901,000.00, which because Victoria was single, the Plaintiff and the Defendant, as her parents, split one-half of said settlement to each.
After the settlement, the Defendant went to the Philippines for a while.
The parties each established a separate brokerage account with the settlement proceeds.
After Victoria's death, the parties did seek some counseling to try and improve their relationship and get over the loss of their daughter.
When the Defendant would be away, his Coast Guard retirement check in the amount of $1,400.00 monthly would come to the home and be used by the Plaintiff for expenses of the family.
The Defendant receives Social Security which is direct deposited.
The home residence of the parties was purchased 21 years ago and may need some modest repair.
Some time after Victoria's death, the Plaintiff's brother, who had lost his position as manager of Sage Allen in Old Saybrook, CT Page 3376 approached the Plaintiff and persuaded her to invest in a business entity, known as Sage Allen II, which business dealt in men's and women's clothing and apparel and is located in Old Saybrook.
Plaintiff's brother prevailed upon her to put up $350,000.00 as collateral with Fleet Bank incident to this business endeavor and to sign certain guarantees incident thereto.
Plaintiff started visiting the business in December of 1993.
Problems developed due to the conduct of Plaintiff's brother and irregularities thereto and Plaintiff, who was a principal stockholder in Sage Allen II, was required to fire her brother.
Plaintiff's brother subsequently allegedly filed bankruptcy according to Plaintiff's testimony.
Due to problems in the business, Fleet Bank called the loan and took the collateral pledged by the Plaintiff to the amount of approximately $300,000.00.
In addition, the landlord of Sage Allen II, Cherry-Webb, who had secured from the Plaintiff a letter of credit in the amount of $120,000.00, which was a guaranty of lease payments, executed on this instrument to the Plaintiff's further loss of $125,000.00.
The subject lease had been negotiated by the Plaintiff's brother and he had revailed on the Plaintiff to put up this sum.
Plaintiff has tried to operate and conduct the business known as Sage Allen II with little success.
In 1995, Plaintiff met with Attorney David R. Scott who concentrates on business law and allied problems and was advised to, in effect, cut her losses and liquidate the business.
Attorney Scott reviewed the overall business status, the loan and guaranty situations, the letter of credit and endeavored to counsel the Plaintiff in the realm of business management and allied matters and made recommendations to her.
Plaintiff's brother had negotiated the lease for the business with no participation by the Plaintiff, which lease turned out to be onerous and disastrous. CT Page 3377
When Fleet called the collateral, everything due was taken from the Plaintiff and $18,000.00, which the Plaintiff's brother had put up, was allowed to be returned to him.
In due course, the corporation Sage Allen II, with the help of counsel, gave the Plaintiff a note whereby Plaintiff would stand in the shoes of the bank, but query as to the value of the note.
The business, Sage Allen II, after the seizure of the $120,000.00 by the landlord, moved to smaller quarters.
Plaintiff is now faced with liquidating the store's inventory and fixtures.
Mr. James Tryon, a CPA, assisted the Plaintiff in the preparation of the 1997 income tax return for the business.
The Plaintiff owes Linda Gilbert $75,000.00. Ms. Gilbert put some money into the business and has tried to assist in its operation.
The Defendant has taken various sums from his assets since the complaint for dissolution was filed, some used for travel, some for gambling and some as gifts or assistance to the children of the parties.
The Defendant had no contact with, nor did he participate in, the Plaintiff's business endeavor with her brother, and when the brother approached the Defendant regarding loans or investment, he was rebuffed.
At the time of Victoria's untimely death, the Plaintiff also received as the specific named beneficiary, life insurance proceeds in the amount of $88,000.00.
The Plaintiff guaranteed, pledged or invested as much as $505,000.00 in the Sage Allen II venture, primarily due to her brother's urging.
The Defendant currently stays in Spring Valley, California. He has stayed there since October of 1996 except for traveling.
Other residents at the Spring Valley location are Susan Factur, a third cousin, and her children. CT Page 3378
Defendant visits Reno, Nevada and Weyneme, California, where siblings of his reside.
Defendant's retirement from the Coast Guard where he was a petty officer storekeeper/cook was in 1975 after 20 years of service.
Defendant's work at the Coast Guard Academy after retirement was doing maintenance work.
At one point, Defendant received a lump-sum pension payment of $18,000.00, which he used to pay off a debt on a Cadillac car for Plaintiff and gave some funds to his children.
Defendant started to collect Social Security at age 62 in 1994.
Defendant takes Tylenol for a stiff back.
Defendant has been at Spring Valley, California for approximately nine months.
Defendant does not own a motor vehicle and relies on others for transportation.
After Victoria's death, the Defendant invested his funds.
Starting in November 1996, the Defendant withdrew $50,000.00 from his Oppenheimer fund and represented he gave each of five grandchildren $5,000.00 and that he spent the balance.
On May 20, 1997, the Defendant withdrew $20,000.00 from his Oppenheimer fund and indicated he lost most of the money gambling at Yuma, Arizona.
On September 30, 1997, Defendant withdrew $15,000.00 from his funds and gave some funds to a sister who was ill and gambled the remainder.
On December 9, 1997, the Defendant took $20,000.00 from the Oppenheimer fund and testified he lost it gambling.
Defendant testified he gave $110,000.00 to one of his children to buy a home.
Defendant did not present any paper evidence of the gifts to CT Page 3379 his children nor the gambling losses.
Within the last 18 months, the Defendant, on the occasion of being in the Philippines, represented that he had put a substantial deposit on some land, but that the matter turned out to be a swindle and he lost his funds.
The Defendant is age 66, he was born in the Philippines, he graduated from high school and after retirement attended Thames River college for 2-1/2 years studying engineering.
The Defendant joined the Coast Guard at age 23.
In the Coast Guard, he was a cook, baker and storekeeper.
The Defendant has worked as a cook at Howard Johnson's and at a restaurant for one, John Holton.
Defendant also did painting and carpentry work.
When the home of the parties was first acquired, the Defendant put down between five and $6,000.00 as a deposit from his savings.
Defendant made many improvements to the home over the years.
The Defendant had to give up painting work when he became allergic to paint fumes.
In the 1980's, the Defendant had surgery on his shoulder due to a ladder incident, and in March of 1996, sustained the slipped disc injury.
The Defendant was afflicted with kidney stones for which he was hospitalized and still has residual problems incident thereto.
The Defendant is adversely affected by cold damp weather.
Being in the military, the Defendant believed in reasonable discipline for his children.
During the 1980's, the Plaintiff and Defendant held an equity interest in some land in Ocala, Florida, but the required payments were not made and the interest in the premises was lost. CT Page 3380
The Defendant acknowledged one incident of kicking the Plaintiff.
In 1995, the parties filed joint income tax returns.
In 1996, the Plaintiff filed separately with the IRS.
The Defendant has medical coverage available to him incident to his Coast Guard service. He also has medical coverage available under the mail handler's insurance plan.
Defendant's highest military rating as an enlisted man was that of a first class petty officer.
Linda A. Gilbert initially worked for the Plaintiff's brother, Randy Murallo, at Sage Allen.
On the liquidation of Sage Allen, Ms. Gilbert invested in Sage Allen II to the amount of $10,000.00, and subsequently, in 1996, put in $75,000.00.
Plaintiff first met Ms. Gilbert in 1993.
Ms. Gilbert is owed $82,000.00 concerning Sage Allen II and holds a note from the Plaintiff for $75,000.00, which has been called by Ms. Gilbert's attorney.
In 1997, Ms. Gilbert received repayment of $17,000.00.
The present outstanding lease for the premises Sage Allen II occupies is the personal responsibility of Ms. Gilbert.
Ms. Gilbert has paid the rent for the store premises for January and February 1998 at the rate of $2,500.00 per month.
Ms. Gilbert is now employed by the landlord.
Sage Allen II now has four employees including a tailor; two of the employees are part-time.
The Plaintiff has applied for unemployment compensation, but has not yet been advised as to eligibility.
The Plaintiff is age 58 and enjoys good health.
The Plaintiff's earlier employment at Bradlees, Stop and CT Page 3381 Shop, Beit Bros. and the Sheffield Co., did not qualify her for business or mercantile supervision or direction.
The Plaintiff has an interest in certain real estate known as 67 Bloomingdale Road in Quaker Hill, which she owns in common with two other siblings.
Mr. John A. Marcure is a CPA who has reviewed the Plaintiff's books and records and tax returns.
Plaintiff is the majority stockholder of Sage Allen II owning 51% of the stock.
The book value of the corporate assets, according to Marcure, as of December 31, 1996, was $212,536.00.
The average daily gross receipts in 1997 for Sage Allen II was $925.00.
The value of the corporation's office equipment, personalty, display tables and counters is approximately $25,000.00 at this time.
The corporation EVM Inc., dba Sage Allen II, located on the Boston Post Road in Old Saybrook, had gross receipts for 1996 of $739,816.00, with a gross profit of $307,555.00, but total deductions of $387,125.00 for a loss of $79,570.00. See Plaintiff's Exhibits 3 and 4.
In 1995, the Plaintiff received $20,800.00 in wages according to the joint income tax return filed by the Plaintiff and the Defendant. See Plaintiff's Exhibit 18.
In 1996, the Plaintiff received $32,300.00 in wages, according to the income tax return filed by the Plaintiff. The Defendant apparently filed separately. See Plaintiff's Exhibit 19.
On November 20, 1996, the Defendant signed a financial affidavit indicating that he received Social Security benefits of $113.95 a week, plus retirement income of $325.58 a week, for a weekly gross of $439.53, less taxes of $70.00, for a net of $369.53.
Defendant's total expenses according to the affidavit were $414.98.
Defendant's Oppenheimer fund per said affidavit was valued at $250,000.00. See Plaintiff's Exhibit 21. CT Page 3382
At time of trial the respective financial affidavits filed with the Court were as follows.
Plaintiff
Position: President, Sage Allen II
 Gross weekly wage $350.00 Deductions 70.00 ------- Net $280.00
Additional income
 Alimony 50.00 ------- Total $330.00
Weekly expenses $583.00
Debt including debt to Ms. Gilbert $80,615.00
Real estate at 33 Lisa Lane, Uncasville
Valued at $140,000.00, Mortgage $13,500.00
Equity $126,500.00
 Note: real estate joint names. Other real estate owned with siblings showing a minus equity.
1989 Cadillac Automobile $2,000.00
Kemper Fund and Bonds $86,512.00
Defendant
Position: Retired from U.S. Coast Guard
Social Security $119.26 weekly
Retirement Income Gross 325.58
Less Deductions 80.00 CT Page 3383 ------ Net weekly $364.73
Weekly expenses $379.69
Debt 0.00
Real estate at 33 Lisa Lane, Uncasville
Valued at $140,000.00, Mortgage $13,500.00
1/2 of Equity $68,250.00
Kemper and Oppenheimer Funds $200,000.00
Checking and Savings $4,800.00
Cash Value Life Insurance $7,955.00
After reading the respective depositions of the parties, which were had prior to the trial, see Plaintiff's Exhibit 24 and Defendant's Exhibit 26, they support in many respects the trial testimony of the parties.
Basically, the Court is of the view that the Defendant is and was a hard working, career Coast Guard retiree relatively unlettered insofar a higher education is concerned but a person concerned for his children.
Admittedly, there were intervals of a wall of silence between the parties and a gradual drifting apart, especially after Victoria's death.
The Plaintiff, whose education did not extend beyond high school, did devote herself to raising the children and maintaining the home.
With all due respect, the greatest problem created for the Plaintiff was her participating in a financial business endeavor urged on her by her brother.
The Plaintiff with her guarantees and financial support to her brother in the Sage Allen II venture was a disaster.
If the Plaintiff, who was totally unsophisticated in business CT Page 3384 and finance, had been left to her own devices, she would undoubtedly be financially secure today.
The Court is satisfied that the Plaintiff had no real concept of the financial position she placed herself in as a result of trying to assist her brother.
The Law
At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other.
In fixing the nature and value of the property, if any, to be assigned the Court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income.
The Court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates.
Connecticut General Statutes (C.G.S.) § 46b-81(a) and (c).
The Court also considers C.G.S. § 46b-82.
Discussion and Recapitulation
The parties married over 41 years ago in New London. The Defendant was in the Coast Guard and the Plaintiff was 17 years old and just out of high school. They married in her parents' home and resided with her parents during the first year of the marriage.
During the 40 years of the marriage, the Plaintiff devoted CT Page 3385 her life to raising five children, maintaining a household and supporting the Defendant in his career endeavors.
The Plaintiff followed and supported the Defendant in his Coast Guard career.
In June 1989, the parties' only daughter, Victoria, was tragically killed in an automobile accident.
By 1975, the Defendant had retired after 20 years in the Coast Guard. The parties had purchased their current residence in Uncasville and the Defendant was working at the Coast Guard Academy for the Federal Civil Service.
At age 58, around the time of Victoria's death, he quit work and took his lump-sum retirement of $18,000.00.
The Defendant currently receives a Coast Guard pension and Social Security benefits, totaling $445.00 per week.
When the Defendant filed his affidavit in November 1996 (Plaintiff's Exhibit 1), he reported $250,000.00 in his investment funds.
From his A.G. Edwards accounts, the Defendant made the following withdrawals: March 27, 1996 — $25,000.00, September 18, 1996 — $10,000.00, November 1, 1996 — $50,000.00, May 20, 1997 — $20,000.00, September 30, 1997 — $15,000.00, December 9, 1997 — $20,000.00, total — $140,000.00.
Plaintiff, at age 58, has no real marketable skills, no educational basis or acumen that would enable her to secure employment, and her age, as well as her lack of skills, would surely be an impediment.
The home in which Plaintiff resides has $126,500.00 equity. It requires modest updating and improvements. It has been her family home for over 20 years and she desires to continue to have it as a home for her children and grandchildren. The mortgage is modest.
She has $86,000.00 left in her investment funds, but that and her home may be in jeopardy from the debt owed to Linda Gilbert of $75,000.00, upon which demand has been made. CT Page 3386
The Plaintiff, gave in to her brother's entreaties to "merely" put up her settlement funds as collateral for his opening Sage Allen II store in 1993.
Plaintiff, unschooled, unsophisticated and totally without business acumen, signed personal guarantees for the business with Fleet Bank.
The Plaintiff's brother negotiated an onerous lease with Cherry and Webb Company and secured by a $120,000.00 letter of credit from Plaintiff.
Plaintiff learned that her brother was mismanaging the business. Having been granted 51% of the shares, she fired her brother, causing Fleet to call the note. She lost $206,000.00 and her brother allegedly goes bankrupt.
From 1993 onward, Plaintiff invests $179,000.00 of her funds into the business for inventory and operating expenses
Linda Gilbert put a total of over $89,000.00 into the business, getting a personal note for $75,000.00 to secure her interest. She was paid back $14,000.00 and is still owed $75,000.00.
Business receipts declined dramatically as the shopping center in Old Saybrook deteriorated and the factory outlets in Clinton and Westbrook opened and took business away.
Linda Gilbert personally negotiated a lease for small space in the same shopping away.
Plaintiff started with $450,000.00 in 1991, plus approximately $88,000.00 life insurance proceeds. She has lost $179,000.00, $206,000.00 and $120,000.00, totaling $505,000.00 of her funds, and after some pay backs to her, has a loss of $448,000.00.
During Defendant's career in the Coast Guard, he performed "isolated" duty in Alaska, during which time he received only sporadic correspondence from Plaintiff.
Plaintiff seeks a monetary award of $2,500.00 alleging that Defendant had not provided documents to her. In fact, he did not have the documents she sought, and he has furnished all authorizations requested of him. CT Page 3387
The Defendant appeared candid with the Court and described a time when he kicked his wife and a time when he lost patience with his young son who was intoxicated, demanding that his sons take responsibility for their actions. In fact, the young son's drinking led to an automobile accident, supporting Defendant's concern in this regard.
The Defendant admitted that he had used some of the settlement proceeds from Victoria's death for entertainment, such as gambling, gave large sums to his adult sons for wedding, home buying, took trips to the Philippines to see his family, and yet, he appeared truthful about the fact that he simply did not have records of his spending.
The Defendant is a man who was born in the Philippines and worked on his parents' farm before joining the Coast Guard. He was a cook in the Coast Guard and worked a second job for most of his Coast Guard career, so that the total hours he worked each week totaled nearly 36 for his part-time job and a typical 40 hours each week for his Coast Guard job.
Because daughter, Victoria died without a will, the law of intestacy in the State of Connecticut provided one-half of her estate to each parent and so Defendant and Plaintiff each received one-half of her estate.
The parties placed their respective shares of the daughter's estate in separate bank accounts, invested it separately, and never consulted the other party about investment decisions or decisions about how the money would be spent.
The Defendant is age 66 and is a recipient of Coast Guard pension and social security income. He was a cook in the Coast Guard, he did odd jobs in restaurants, he did handyman jobs, and he was a painter as a civilian employee at the Coast Guard Academy in New London.
In 1996, the Plaintiff's W-2 earnings from Sage Allen II were $40,000.00.
The parties are in accord that the Plaintiff is the survivor beneficiary of Defendant's Coast Guard pension, so that upon his death, she will be protected. CT Page 3388
The Plaintiff now resides in the former marital home by herself.
The Defendant currently rents a room in his cousin's home in California where the cousin and her family reside. He described the room as simply a single bedroom next to the garage with bathroom and kitchen privileges.
The Plaintiff's requests to the Court were as follows:
1. to retain the home
2. to receive 1/2 of the Defendant's Coast Guard pension
 3. to receive Cobra benefits through the Defendant's Federal Civil service
4. a cash settlement
 5. to remain as beneficiary on the Defendant's life insurance policy.
But for the Plaintiff's ill-advised excursion into the business world at her sibling's entreaty, the Plaintiff would undoubtedly be in a strong, economically sound, financial position, which might even have allowed the marital union to continue, mindful of 41 years of being husband and wife.
The Defendant, following a more conservative posture, was and still is in a financially secure position, even mindful of squandering some funds on gambling.
The Court enters the following orders.
The Defendant shall convey and set over to the Plaintiff all of his right title and interest in the premises known as 33 Lisa Lane, Uncasville and the Plaintiff to be solely responsible for the existing mortgage balance of approximately $13,500.00, and to indemnify and hold the Defendant harmless therefrom including any other charges or taxes due thereon.
The Plaintiff shall be entitled to 35 percent of the Defendant's Coast Guard pension, mindful of the fact that the Defendant had served some years in the Coast Guard before the marriage. CT Page 3389
The Plaintiff may retain her interest in her Kemper Fund and her bonds.
The Plaintiff may retain her interest in certain real estate known as 67 Bloomingdale Road, Quaker Hill, owned in concert with her siblings.
Plaintiff may retain her interest in the business entity known as Sage Allen II.
Plaintiff may retain title to her automobile.
Plaintiff may retain the contents and furnishings of the residence at 33 Lisa Lane, Uncasville.
In the event that there are certain items of personalty including clothing, military memorabilia photographs, etc., the Defendant shall be entitled thereto on giving reasonable notice to the Plaintiff.
The Defendant shall pay the sum of $30,000.00 to the Plaintiff.
The Defendant shall provide Cobra benefits to the Plaintiff under his existing policy for a period of three years at his expense.
The Defendant shall maintain the life insurance policy on his life with the Plaintiff as sole irrevocable beneficiary until her death.
The Defendant may retain the balance of his Kemper and Oppenheimer Funds and his checking and savings account.
No alimony is awarded to either party.
Both parties to cooperate in executing all necessary documents to effect the orders of the Court. Each party shall be responsible for their respective counsel fees.
The marriage is dissolved on the grounds of irretrievable breakdown and the parties are declared to be single and unmarried.
Austin, J. CT Page 3390